In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-2688

DERRICK NICHOLS, BABATUNDE OWOSENI,
DANIEL SMITH, et al.,

*Plaintiffs-Appellants,*

*v.*

SOUTHERN ILLINOIS UNIVERSITY-EDWARDSVILLE,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Southern District of Illinois.
No. 04 C 555—**G. Patrick Murphy**, *Judge.*

———————

ARGUED JANUARY 5, 2007—DECIDED DECEMBER 28, 2007

———————

Before FLAUM, MANION, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge.* Derrick Nichols, Babatunde Owoseni, Daniel Smith, and Aaron Watson, current and former officers of the Southern Illinois University Police Department, sued Southern Illinois University (the "University") alleging that it discriminated against them because of their race by disproportionally assigning them to work at its East St. Louis campus. Owoseni, Smith, and Nichols also alleged that the University denied them temporary upgrades to sergeant because of their race and

retaliated against them for making complaints of racial discrimination. The University moved for summary judgment on all of the plaintiffs' claims, and the district court granted the University's motion. The plaintiffs appeal. We affirm.

I.

Derrick Nichols, Babatunde Owoseni, Daniel Smith, and Aaron Watson (collectively the "plaintiffs") are current and former officers of the University's police department (the "Department"). Nichols and Watson currently are employed by the University, while the State Universities Civil Service Merit Board (the "Merit Board") terminated Owoseni's and Smith's employment in September 2003. Each of the plaintiffs is black.

The University is a multi-campus public university with facilities in East St. Louis, Alton, and Edwardsville, Illinois. The Department is responsible for patrolling the University's East St. Louis and Edwardsville campuses. The smaller East St. Louis campus is located in a predominantly black residential area, while the larger Edwardsville campus is located in a predominantly white residential area. Because the East St. Louis campus is smaller, officers' duties at that campus tend to be less strenuous. According to the Department's policy, officers must be willing to work at either campus, and officers are stationed at a campus for a semester-long assignment. Regardless of an officer's campus assignment, all officers received the same pay, benefits, and opportunities for advancement.

The Department's command staff makes assignments to the two campuses with input from its sergeants, lieutenants, captains, and chief. First, the lieutenant in charge of

the patrol division prepares the schedules. The captain supervising the division then must approve the schedules. The Department's chief is responsible for giving the final approval to the assignments.

Officers may request assignment to a particular campus, and all but one of the plaintiffs directly or indirectly requested assignments to the East St. Louis campus.[1] For example, from August 2002 through May 2003, Watson requested an assignment to the East St. Louis campus so that he could be closer to another college where he was finishing a degree. When there was a temporary manpower shortage, Watson agreed to work at the East St. Louis campus on July 16 and July 17, 2003, and on August 27, 2003, he authored a memorandum to his sergeant stating that he did not have a preference regarding his campus assignment. In late 2001, Smith also requested assignment to the East St. Louis campus from December 2001 through December 2002, and he was assigned to that campus from August through December 2002. Further, Owoseni requested to work with a sergeant who was primarily assigned to the East St. Louis campus. In addition to the plaintiffs, a number of white officers requested assignment to the East St. Louis campus and were assigned to that campus. The plaintiffs nonetheless allege that the Department disproportionally assigned them to the East St. Louis campus based on their race.

The plaintiffs also make allegations regarding the Department's promotion and upgrade practices. The University's collective bargaining act ("CBA") distin-

---

[1] Only Nichols did not submit an assignment request for the East St. Louis campus.

guishes between promotions and temporary upgrades. Promotions are permanent appointments to a higher position (e.g., officer to sergeant), which are governed by the State Universities Civil Service Act ("Civil Service Act"), 110 ILCS 70/0.01 et seq., and the CBA. Officers may only be promoted to sergeant if they pass qualifying examinations administered pursuant to the Civil Service Act and the CBA and are placed on a "register." None of the plaintiffs had passed all portions of the qualifying exam, and thus they were ineligible to be placed on the "register" for promotions. On the other hand, upgrades are not permanent and function to fill vacancies on an as-needed basis. Upgrades may last for one shift, or, under unusual circumstances, they may last as long as several months. Unlike promotions, the Department's management team determines which officers receive upgrades. All officers are eligible to receive upgrades, and at least Owoseni and Smith periodically received them.

In late 2002, two sergeant positions opened when one sergeant left the Department and another was called to active military duty. At that time, there were no sergeant candidates on the promotion register, i.e., none had passed both the written and oral examinations.[2] The Department thus looked for candidates for temporary upgrades. In October 2002, the Department upgraded Rich Delmore, who is white, to temporarily fill a sergeant vacancy at the Edwardsville campus. The Department's management team stated its belief that Delmore was the most qualified individual for the job due to his prior performance as an officer. During a Department meeting

---

[2] Owoseni and Nichols had passed the written examination and were awaiting an opportunity to sit for the oral examination.

at which the upgrade decision was considered, the attendees lauded Delmore's method of report writing, his ability to interview, his punctuality, and his ability to represent the University. One month later, in November 2002, the Department temporarily upgraded Jim Royston, who also is white, to temporarily fill a sergeant vacancy at the East St. Louis campus. Prior to upgrading Royston, the Department held a meeting regarding potential candidates, and the attendees discussed Royston's communication skills, ability to supervise, decision-making and problem-solving skills, and his relationships with other members of the Department and the University, in particular those within the East St. Louis community. Captain Tony Bennett also testified that the management team believed that Delmore and Royston were the most qualified individuals for the job based on the skill they demonstrated as police officers, and that the decision was not based on race. Nichols, Owoseni, and Smith, all of whom were eligible for the upgrade but were not selected for it, responded by claiming that the University denied them the temporary upgrades to sergeant because of their race.

Later that month, on November 26, 2002, Owoseni, Smith, and Nichols met with Chief Richard Harrison and Captain John Oltmann to discuss their complaints regarding the Department's alleged discriminatory employment practices. During the meeting, Owoseni spoke on behalf of Smith, Nichols, and himself, and he made a number of unsubstantiated allegations against Chief Harrison and against the Department's command staff.[3] A

---

[3] The Merit Board later determined that Owoseni knowingly made numerous untruthful statements about Chief Harrison and other command staff during the November 26, 2002, meeting.

(continued...)

few weeks later, in mid-December 2002, Smith, Owoseni, and Nichols each wrote letters to the University's president, repeating the allegations that Owoseni made during the November 26, 2002, meeting, as well as adding other allegations. In particular, Owoseni alleged in his letter that Chief Harrison engaged in a cover-up to protect a University parking service agent who was his friend, an allegation later found to be meritless. In his letter, Owoseni further alleged that he was the only officer instructed to desist from making traffic stops on the streets of East St. Louis and that the instruction was racially motivated, despite the fact that he knew that all officers were orally instructed not to make such traffic stops. Smith alleged in his letter that one of the Department's sergeants had been indicted for criminal sexual assault and should have been dismissed by Chief Harrison, even though Smith knew when he wrote the letter that the sergeant had been acquitted of all state charges. Smith further alleged that "Chief Harrison promoted/ upgraded only his white long time friends," and that he "treated his white police friends favorably and rewarded them with promotions."

Around that same time, the University's director of its Office of Equal Employment Opportunity and the University's assistant director of its Department of Human

---

[3] (...continued)
Specifically, the Board concluded that Owoseni falsely accused Chief Harrison of manipulating civil service test scores so that no black officers could be placed on the "registry" for promotions, and he falsely claimed that Chief Harrison "would go to any length to promote his life-long cohorts whether they were qualified or not."

Resources undertook an extensive investigation into the allegations against the Department. The University's general counsel responded to Owoseni's and Smith's letters to the University's president, advising them that they should submit all complaints to the University's director of its Department of Human Resources or its Office of Equal Employment Opportunity. All four of the plaintiffs subsequently submitted their complaints. The University's investigation culminated in a determination that Smith and Owoseni had committed misconduct warranting the filing of formal charges for discharge with the Merit Board.[4]

A Merit Board hearing officer held evidentiary hearings for Smith's discharge proceedings on June 13 and July 9, 2003, and a different Merit Board hearing officer held hearings for Owoseni's discharge proceedings on June 17 and July 23, 2003. The Merit Board, after rendering its findings of fact, issued its decision and order concluding that there was "just cause for discharge" for both Smith and Owoseni. The Merit Board's decision and order regarding Smith listed the following reasons for his discharge: (1) Smith's recurring gross insubordination

---

[4] Section 36*o* of the State Universities Civil Service Act states that "no employee shall be demoted, removed or discharged except for just cause, upon written charges, and after an opportunity to be heard in his own defense if he makes a written request for a hearing to the Merit Board." 110 ILCS 70/36*o*. If the Merit Board finds "cause" for discharge, then "the employee shall be immediately separated from service." *Id.* The Merit Board's discharge decisions are subject to review by Illinois circuit and appellate courts pursuant to the Illinois Administrative Review Act, 735 ILCS 5/3-101 et seq.

and disobedience to management directives, including personal use of a police squad car; (2) his making and spreading of false statements concerning fellow officers and the chief of police; (3) his writing of an improper letter to the University's president in December 2002; and (4) his failure to cooperate reasonably with a police investigation regarding a newspaper article. The Merit Board's decision and order regarding Owoseni listed the following reasons for his discharge: (1) his recurring gross insubordination and disobedience to management directives and his disrupting the efficient operations of the Department during November and December 2002, and January and February 2003; (2) his making and spreading of false statements concerning fellow officers and superior officers; (3) his writing of an improper letter to the University's president containing false information in December 2002; and (4) his failure to reasonably cooperate with a police investigation and attempts by the Department to help him resolve his employment problems and complaints. Following their discharge, Smith and Owoseni elected not to challenge the Merit Board's decision by filing suit in the Illinois state courts pursuant to the Illinois Administrative Review Act.

While Smith's and Owoseni's proceedings were pending before the Merit Board, Nichols was involved in an incident with a mentally unstable female while on duty following a May 10, 2003, commencement ceremony. The woman attempted to enter a street with busy traffic, and Nichols used force to restrain her, ultimately forcing her to the ground, handcuffing her, and placing her in his police car. Following the incident, the Department placed Nichols on paid administrative leave pending the results of two fitness-for-duty psychological examinations. Once

Nichols completed the examinations, the Department returned him to active, full-time duty. In total, Nichols was on paid administrative leave for approximately three months. Nichols, however, claims that the Department subjected him to the examinations and forced him to go on a paid leave of absence in retaliation for his complaints regarding the Department's alleged race discrimination.

The plaintiffs filed this action against the University in the district court, alleging three claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Specifically, the plaintiffs alleged: (1) that all of them were disproportionally assigned to the University's East St. Louis campus because of their race; (2) that Owoseni, Smith, and Nichols were denied temporary upgrades to sergeant because of their race; and (3) that Owoseni, Smith, and Nichols were retaliated against for making complaints of racial discrimination. The University moved for summary judgment on all of the plaintiffs' claims, and the district court granted summary judgment to the University. The plaintiffs appeal.

## II.

On appeal, the plaintiffs argue that the district court erred in granting summary judgment to the University on their race discrimination and retaliation claims. This court reviews a district court's grant of summary judgment de novo. *Perez v. Illinois*, 488 F.3d 773, 776 (7th Cir. 2007). In doing so, we construe all facts and reasonable inferences in the light most favorable to the non-moving party. *Healy v. City of Chicago*, 450 F.3d 732, 738 (7th Cir. 2006). "Summary judgment is proper if 'the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Id.* (quoting Fed. R. Civ. P. 56(c)).

## A. *Plaintiffs' Disproportionate Assignment Claims*

All four of the plaintiffs allege that they were disproportionally assigned to what they refer to as an inferior job at the University's East St. Louis campus because of their race. An employee can support a Title VII claim for disparate treatment based on race using either the direct method to show that racial discrimination motivated the employment decision, or by relying on the indirect, burden-shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 812-14 (7th Cir. 2007). The plaintiffs attempt to proceed under both methods. Regardless of which method they attempt to proceed under, they must show that they suffered a materially adverse employment action. *See Lewis v. City of Chicago*, 469 F.3d 645, 652-53 (7th Cir. 2007) (citing *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)).

### 1. *No materially adverse employment action under either direct or indirect method.*

As we have stated previously, "A materially adverse employment action is something 'more disruptive than a mere inconvenience or an alteration of job responsibilities.' " *Rhodes*, 359 F.3d at 504 (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir.

1993)). "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004). "Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Id*. Thus, for purposes of Title VII, we have articulated three general categories of actionable, materially adverse employment actions:

> (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

*Id*. (citing *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002) (citations omitted)). We have cautioned, however, that cases in the second category "are to be distinguished from cases involving a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance." *Id*. Further, " '[a] transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either.' " *Id.* at

911-12 (quoting *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996)).

The plaintiffs assert that their assignment to the East St. Louis campus constitutes a materially adverse employment action because the policing requirements at the larger Edwardsville campus are more interesting and intensive. For instance, the plaintiffs claim that officers working on the Edwardsville campus "perform the interesting, varied and challenging work of real police officers . . . which include[s] enforcing traffic laws, making arrests and investigating crimes." The plaintiffs conversely assert that officers working on the East St. Louis campus perform "the boring repetitive and semiskilled work of mere security guards, which involve[s] monitoring hallways and patrolling buildings." The University counters that three of the four plaintiffs directly or indirectly requested assignment to the East St. Louis campus, and that the University does not distinguish between an officer's service at a particular campus in making salary or promotion decisions.

This case is analogous to *O'Neal v. City of Chicago*, 392 F.3d 909 (7th Cir. 2004), so we turn to that decision for guidance. In *O'Neal*, a police officer was transferred from the narcotics unit to a beat sergeant position. *Id.* at 910. The officer complained that while both positions carried the same rank, her former position gave her increased opportunities for overtime pay, more supervisory responsibilities, and additional perks, such as the use of a work-provided cellular telephone, pager, vehicle, and parking space, as well as having most weekends and holidays off. *Id.* at 912. We affirmed the district court's grant of summary judgment, holding that the officer's "complaints about the transfer reveal only a 'purely subjective prefer-

ence for one position over another,' which does not 'justify trundling out the heavy artillery of federal antidiscrimination law.'" *Id.* at 913 (quoting *Herrnreiter*, 315 F.3d at 745).

In this case, the plaintiffs' claim is even weaker than the officer's in *O'Neal*. The plaintiffs here argued only that they preferred the work at the Edwardsville campus, and that claim is contradicted by three of the four plaintiffs' specific or contingent requests to work at the very location they purport to disdain. Further, in this case there is no evidence that their assignment to the East St. Louis campus impacted the plaintiffs' salary, perks, or opportunities for future advancement. This indicates that the plaintiffs' complaints involved purely subjective preference for one assignment over another. The plaintiffs thus failed to allege a materially adverse employment action. Accordingly, the district court did not err in finding that, under either the direct or indirect method, the plaintiffs failed to proffer sufficient evidence to support their claim that the Department disproportionally assigned its officers based on race, or in granting summary judgment in favor of the University on that claim.

2. *Additionally, no direct or circumstantial evidence of discriminatory motive.*

Moreover, even if the plaintiffs had alleged a materially adverse employment action, they did not proffer sufficient evidence of the University's discriminatory motive in disproportionally assigning them to work at the East St. Louis campus to create a triable issue under the direct method. *See Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 721 (7th Cir. 2005) (stating that a plaintiff proceeding

according to the direct method "can avoid summary judgment for the other party by 'creat[ing] a triable issue of whether the adverse employment action of which [s]he complains had a discriminatory motivation.'" (quoting *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1397 (7th Cir. 1997)) (alteration in original)). "A plaintiff proceeding according to the direct method may rely on either direct or circumstantial evidence." *Sun*, 473 F.3d at 812. "Direct evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Rudin*, 420 F.3d at 720. "Circumstantial evidence of discrimination is evidence which allows the trier of fact to infer intentional discrimination by the decisionmaker." *Sun*, 473 F.3d at 812. In this case, under the direct method, the plaintiffs claim that they have both direct and circumstantial evidence of discrimination.

The plaintiffs claim that Chief Harrison's alleged statement "that the administration at East St. Louis wanted to see more 'black faces' among [its] police force" constitutes direct evidence of the Department's discriminatory motive. We have previously stated that an employer's statement that he made an employment decision based upon racial animus qualifies as direct evidence of discriminatory motive. *See, e.g.*, *Rudin*, 420 F.3d at 720 ("'[D]irect evidence would be what [the employer] said or did in the specific employment decision in question.' For example, evidence that an employer 'said he discharged [the plaintiff] because he is black' constitutes direct evidence." (quoting *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997)) (alterations in original)). We have held, however, that "stray remarks that are neither proximate nor related to the employment decision are insufficient

to defeat summary judgment." *Sun*, 473 F.3d at 813. Further, the "statements of a person who lacks the final decision-making authority may be probative of intentional discrimination," but only "if that individual exercised a significant degree of influence over the contested decision." *Id*. Here, the statement at issue purports to be a suggestion from someone in the East St. Louis campus administration to Chief Harrison to assign more black officers to that predominantly black campus. This statement fails to constitute direct evidence of the Department's alleged discriminatory motive because the Department's command staff, and ultimately Chief Harrison, are solely responsible for assigning Department officers to the two campuses. There is no evidence in the record to indicate that Chief Harrison was in any way influenced by or acted upon any such suggestion by one or more members of the East St. Louis administration. Chief Harrison, who was the final decisionmaker regarding campus assignments, testified that he explicitly rejected any such suggestion, and he stated that his assignment decisions were not based upon the plaintiffs' or any other officer's race.[5] Additionally, notes taken at a meeting between Chief Harrison and other officers indicate that the suggestion to assign officers based on race was discussed and Chief Harrison rejected it. Finally, there also is no evidence in the record from which to conclude which individual or individuals from the East St. Louis campus made the

---

[5] Chief Harrison testified he initially rejected the suggestion to assign black officers to the East St. Louis campus because the contract in place at the time dictated that officers were assigned based on seniority. He further testified that once the seniority-based assignment system ended, he continued to reject the idea of assigning officers based on their race.

suggestions to Chief Harrison, nor is there any evidence indicating that the individual or individuals had any authority whatsoever over Chief Harrison or any other officer in the Department.

The plaintiffs also attempt to proffer circumstantial evidence to prove the University's discriminatory motive under the direct method. Specifically, the plaintiffs offer what they assert is statistical evidence that the Department disproportionally assigned them to the East St. Louis campus because of their race. We have recognized three types of circumstantial evidence of intentional discrimination:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.

*Id.* at 812 (citing *Rudin*, 420 F.3d at 720-21). The plaintiffs' evidence falls into the second category. As we have stated previously, a plaintiff may use pattern evidence of disparate treatment even if that evidence is not rigorously statistical, although, standing alone, it is insufficient evidence to withstand summary judgment. *Id.* at 813 (stating that "[a]lthough the [plaintiff's] sample size is insufficient to provide statistically reliable evidence, the [university's promotion and tenure committee's] voting pattern has some probative value regarding discriminatory employment practices"; however, "a questionable

pattern of promotion, standing alone" is insufficient evidence to withstand summary judgment). In this case, the plaintiffs' statistics show that, from the 2001 summer semester through the 2002 fall semester, the four plaintiffs collectively received seventeen semester assignments, which were broken down between eleven assignments to the East St. Louis campus (61%), and six assignments to the Edwardsville campus (39%). In contrast, during that same time period, the Department's eighteen white officers collectively received fifty-nine semester assignments, which were broken down between fifteen assignments to the East St. Louis campus (25.4%), and forty-four assignments to the Edwardsville campus (74.6%). Individually, the four plaintiffs were assigned to the East St. Louis campus for the following percentage of their semester assignments during that time period: Owoseni 80%; Watson 66.6%; Smith 60%; and Nichols 40%. With the exception of Nichols, the plaintiffs' statistics do show that the Department assigned them to work at the East St. Louis campus more frequently than the Edwardsville campus. The plaintiffs' statistics, however, omit a critical variable in the Department's assignment process: the plaintiffs' own requests to work at the East St. Louis campus. The record shows that both Watson and Smith specifically requested to work at the St. Louis campus, and Owoseni indirectly requested to work at that campus when he requested to work with a sergeant who was primarily assigned there. The plaintiffs' own statistics evince that the only one of them who did not request to work at the East St. Louis campus, Nichols, was assigned to the Edwardsville campus the majority of the time. Accordingly, the mere fact that the Department assigned three of the plaintiffs to work at the East St. Louis campus for the majority of their semester assignments, when each

of those plaintiffs either specifically or contingently requested to work there, is not sufficient circumstantial evidence to proceed under the direct method.

### B. *Owoseni's, Smith's, and Nichols's Failure to Upgrade Claims*

Owoseni, Smith, and Nichols also assert that the district court erred in granting summary judgment in favor of the University on their claim that the Department denied them two temporary upgrades from officer to sergeant because of their race, when the Department selected two white officers to fill those positions. An employee can support a Title VII claim for failure to promote in one of two ways, either by "directly show[ing] that racial discrimination motivated the employment decision, or, as is more common, [by relying] on the indirect, burden-shifting method." *Sublett v. John Wiley & Sons*, 463 F.3d 731, 736-37 (7th Cir. 2006). Owoseni, Smith, and Nichols have not offered any evidence of discriminatory upgrades under the direct method, and thus they proceed under the burden-shifting method. Under the indirect method, Owoseni, Smith, and Nichols bear the initial burden of establishing a prima facie case of race discrimination by showing that: (1) they are members of a protected group; (2) they were qualified for the position sought; (3) they were rejected for the position; and (4) the employee who was promoted was a member of a different race and was not better qualified than they. *Id.* at 737 (citing *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 732 (7th Cir. 2001)). If Owoseni, Smith, and Nichols carry their burden, then the University must set forth a legitimate, nondiscriminatory reason for its decision to upgrade the white officers, "which if believed by the trier of fact,

would support a finding that unlawful discrimination was not the cause of the employment action." *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)). Finally, if the University succeeds in articulating a non-discriminatory reason for its upgrade decisions, then Owoseni, Smith, and Nichols resume their original burden of proof and must establish by a preponderance of the evidence that the University's proffered reason is pretextual. *Id.*

Owoseni, Smith, and Nichols potentially satisfy the first three elements of their prima facie case, in that they are black, they were arguably qualified for the upgrade to sergeant, and the Department rejected them for the upgrade. Their claim fails, however, because they did not offer sufficient evidence that they were equally or more qualified than the two white officers whom the Department upgraded to sergeant, Delmore and Royston. The only evidence Owoseni, Smith, and Nichols point to in the record regarding Delmore's and Royston's qualifications is found in their deposition testimony, which fails to set forth any details of the upgraded officers' qualifications. During his deposition, Nichols stated that he did not know Delmore's educational background, the amount of hands-on experience Delmore possessed, or the type of training Delmore had undergone. Nichols also testified that while he was aware that Royston had twenty years' experience with the University, he was not aware of Royston's educational background. Likewise, Smith stated during his deposition that "I had no information on Officer Delmore." Smith further testified that he did not know Royston's qualifications and background other than what he learned during prior depositions, and he stated that he did not know the Department's criteria

for determining upgrades. Owoseni also testified during his deposition that he could not recall anything regarding Delmore's qualifications or background, and he stated that the only thing he knew about Royston's background was that Royston had worked for the University for approximately twenty years before he was upgraded. We are unable to glean anything regarding Delmore's and Royston's qualifications from these statements, and Owoseni, Smith, and Nichols do not offer any additional evidence. Instead, they rely on their own subjective beliefs that they were as qualified or even more qualified for the upgrade than Delmore and Royston. We have repeatedly stated, however, that plaintiffs must offer more than mere self-serving appraisals. *See, e.g.*, *Dunn v. Nordstrom, Inc.*, 260 F.3d 778, 787 (7th Cir. 2001) (stating that the plaintiff "must present more than his own, subjective self-appraisal to create a genuine issue of fact"); *Fortier v. Ameritech Mobile Commc'ns, Inc.*, 161 F.3d 1106, 1114 (7th Cir. 1998) (same); *Gustovich v. AT&T Commc'ns, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992) (same). Owoseni, Smith, and Nichols thus failed to establish a prima facie case that the University discriminated against them based on their race when it denied them temporary upgrades to sergeant. Accordingly, the district court did not err in granting summary judgment to the University on this claim.

## C.   *Owoseni's, Smith's, and Nichols's Retaliation Claims*

Owoseni, Smith, and Nichols also assert that the district court erred in granting summary judgment in favor of the University on their claims that the University retaliated against them for speaking out against the racial discrimination. Specifically, they allege that the University retaliated against them by terminating Owoseni's and

Smith's employment, and by subjecting Nichols to unwarranted disciplinary proceedings and placing him on paid administrative leave pending the results of his fitness-for-duty psychological examinations. Like the plaintiffs' other Title VII claims, Owoseni, Smith, and Nichols may prove retaliation by using either the direct method or the indirect, burden-shifting method. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662 (7th Cir. 2006). Under the direct method, Owoseni, Smith, and Nichols must show that (1) they engaged in statutorily protected activity; (2) they suffered an adverse action taken by the University; and (3) there was a causal connection between the two. *Id.* at 663. Under the indirect method, Owoseni, Smith, and Nichols must establish a prima facie case of retaliation by showing that: (1) they engaged in a statutorily protected activity; (2) they met the University's legitimate expectations; (3) they suffered an adverse employment action; and (4) they were treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Id*. If they succeed in establishing a prima facie case, then the burden shifts to the University to produce a non-discriminatory reason for its employment action. *Id*. If the University meets its burden of production, then the burden of proof remains with Owoseni, Smith, and Nichols to demonstrate that the University's proffered reason is pretextual. *Id*. Owoseni, Smith, and Nichols assert on appeal that they presented sufficient evidence to avoid summary judgment under both the direct and indirect methods. We again examine each in turn.

### 1. *Direct method.*

Owoseni and Smith first argue that they presented sufficient evidence under the direct method that the

University retaliated against them by terminating their
employment. We note, however, that the Merit Board,
rather than the University or the Department, actually
terminated Owoseni's and Smith's employment pursu-
ant to the Civil Service Act. Following hearings before
Merit Board hearing officers, during which both Owoseni
and Smith had the opportunity to be represented by
counsel, introduce evidence, call their own witnesses, and
question the University's witnesses, the Merit Board
terminated their employment upon finding, inter alia, that
Owoseni and Smith made numerous false accusations
against their fellow officers. Specifically, the Merit Board
discharged Smith based on: (1) his recurring gross insub-
ordination and disobedience to management directives,
including personal use of a police squad car; (2) his making
and spreading of false statements concerning fellow
officers and the chief of police; (3) his writing of an im-
proper letter to the University's president in December
2002; and (4) his failure to cooperate reasonably with a
police investigation regarding a newspaper article. The
Merit Board stated that it discharged Owoseni based on:
(1) his recurring gross insubordination and disobedience
to management directives and his disrupting the efficient
operations of the Department during November and
December 2002, and January and February 2003; (2) his
making and spreading of false statements concerning
fellow officers and superior officers; (3) his writing of an
improper letter to the University's president containing
false information in December 2002; and (4) his failure to
reasonably cooperate with a police investigation and
attempts by the Department to help him resolve his
employment problems and complaints. Thus, the Merit
Board's discharge decisions were based on, among
other things, Owoseni's and Smith's baseless allegations

against fellow officers. Significantly, those allegations were separate and distinct from Owoseni's and Smith's potentially actionable allegations that the Department discriminated against them in its assignment and upgrade practices. The latter discrimination allegations played no role in the Merit Board's decisions. "[T]his Court has consistently stated that utterly baseless claims do not receive protection under Title VII." *Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 890 (7th Cir. 2004) (citing cases). Further, neither Owoseni nor Smith has presented any evidence to impugn the Merit Board's credibility or motivation, and thus they cannot establish a nexus between their discrimination complaints and the Merit Board's decision to terminate their employment. In short, the Merit Board decided to terminate Owoseni's and Smith's employment upon finding that they made numerous objectively baseless allegations against their colleagues, in addition to other offenses, and not because they made allegations that the Department discriminated against them.

### 2. *Indirect method.*

Owoseni and Smith also argue that they established that the Merit Board terminated their employment because they complained about discriminatory practices under the indirect *McDonnell Douglas* burden-shifting method. While Owoseni and Smith may be able to satisfy the first three elements of their prima facie case, they are unable to show, however, that any similarly situated employee made numerous baseless allegations against fellow Department employees and was not terminated by the Merit Board. *See Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004) ("A similarly-situated employee must have been disciplined, or not, by the

same decisionmaker who imposed an adverse employ-
ment action on the plaintiff." (citing *Patton v. Indianapolis
Pub. Sch. Bd.*, 276 F.3d 334, 338 (7th Cir. 2002); *Radue v.
Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000))).
Even if Owoseni and Smith had succeeded in identifying
such an employee, they also would have to show that the
employee engaged in other misconduct similar to that in
which the Merit Board found that Owoseni and Smith
had engaged, such as gross insubordination and disobedi-
ence to management directives and failing to cooperate
with a police investigation. Because Owoseni and Smith
have not put forth competent evidence that they were
treated differently than a similarly situated employee
outside of their protected class, they failed to establish a
prima facie case for their retaliation claim. Accordingly,
the district court did not err in granting summary judg-
ment in favor of the University on this claim.

Next, Nichols argues that the district court erred in
granting summary judgment in favor of the University
on his claim that the University retaliated against him for
complaining about discriminatory practices by placing
him on paid administrative leave pending the results of
his fitness-for-duty psychological examinations. As dis-
cussed above, the Department put Nichols on paid admin-
istrative leave after he used force to restrain a mentally
unstable woman and placed her on the ground and
handcuffed her following a commencement ceremony.
Regardless of whether Nichols attempts to proceed under
the direct method or indirect method, he must show that
he suffered a materially adverse action. *Pantoja v. Am.
NTN Bearing Mfg. Corp.*, 495 F.3d 840, 848-49 (7th Cir.
2007). The alleged adverse action at issue here is the
Department's placement of Nichols on paid administra-

tive leave. Nichols does not claim that his position, salary, or benefits were impacted by the paid administrative leave, and he concedes that the Department reinstated him to active duty upon receiving the results of his fitness-for-duty psychological examinations. While this circuit has not had an opportunity to address whether an employer's placement of an employee on paid administrative leave pending the conclusion of an investigation constitutes a materially adverse action, our sister circuits have concluded that it does not. *See Breaux v. City of Garland*, 205 F.3d 150, 157-58 (5th Cir. 2000) (finding that a police officer did not suffer any adverse action by being required to undergo a psychological examination following an altercation with a colleague or by being placed on paid administrative leave when he retained his job and had not been demoted or transferred to a less desirable position); *see also Singletary v. Mo. Dep't of Corrs.*, 423 F.3d 886, 891-92 (8th Cir. 2005) (finding that corrections officer did not suffer a materially adverse action when his employer placed him on administrative leave pending a departmental investigation); *Von Gunten v. Md.*, 243 F.3d 858, 869 (4th Cir. 2001) (finding that an employer's placement of an employee on short administrative leave with pay to allow time for internal investigation of complaint in accordance with procedures was not an adverse action), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405 (2006). We agree with our sister circuits, and find that the Department's placement of Nichols on paid administrative leave pending the results of his fitness-for-duty psychological examinations did not constitute a *materially* adverse action. Nichols's retaliation claim thus fails under either the direct method or indirect method. Accordingly, the

district court did not err in granting summary judgment in favor of the University on this claim.

Finally, Nichols asserts a retaliation claim based on the written notice he received requiring him to appear at disciplinary hearings held in response to the letter he had sent to the University's president. That claim was not addressed in the district court's opinion, and the University did not address it in its brief and argument before this Court. Nevertheless, the district court did not err in granting summary judgment on it for the same reason as it granted summary judgment on Nichols's other retaliation claim, namely that Nichols has failed to demonstrate how the notice was materially adverse, especially in light of the fact that the disciplinary proceedings were instituted in response to the plaintiffs' unsubstantiated allegations against other officers. *Cf. Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 462 (7th Cir. 2007) ("An employer's *truthful* report to the police about an employee is not an adverse action." (citing *Aviles v. Cornell Forge Co.*, 241 F.3d 589, 593 (7th Cir. 2001)) (emphasis in original)).

### III.

The plaintiffs failed to show that they suffered an adverse employment action to support their Title VII claims that the Department disproportionally assigned them to inferior jobs at the University's East St. Louis campus because of their race. Proceeding only under the indirect method, Owoseni, Smith, and Nichols also failed to establish a prima facie case that they were denied temporary upgrades to sergeant based on their race, because they did not show that they were as qualified or more qualified than the two white officers who received the upgrades. Additionally, Owoseni's and Smith's retalia-

tion claims failed under the direct method because they did not show that the Merit Board's decision to terminate their employment, which was based, inter alia, on their making objectively groundless claims about their colleagues, was causally connected to their complaints regarding the Department's alleged discriminatory practices. Owoseni and Smith also failed to establish a prima facie case for their retaliation claims because they did not put forth any evidence that they were treated differently than a similarly situated employee outside of their protected class. Finally, Nichols's retaliation claims failed under either the direct method or the indirect method, because the Department's placement of him on paid administrative leave pending the results of his fitness-for-duty psychological examinations after he used force to restrain a mentally unstable woman, like the initiation of disciplinary proceedings against Nichols in response to the plaintiffs' unsubstantiated allegations in letters to the University's president, did not constitute materially adverse actions. Accordingly, the district court's grant of summary judgment in favor of the University is AFFIRMED.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*