**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued April 22, 2008
Decided June 24, 2008

**Before**

KENNETH F. RIPPLE, *Circuit Judge*

TERENCE T. EVANS, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 07-1968

| | |
|---|---|
| NAUREEN STEADMAN, | Appeal from the United States District |
| *Plaintiff-Appellant,* | Court for the Northern District of Illinois, Eastern Division. |
| *v.* | |
| | No. 04 C 3941 |
| URBAN RETAIL PROPERTIES CO., | |
| *Defendant-Appellee.* | Joan B. Gottschall, *Judge.* |

**O R D E R**

Naureen Steadman, an atheist, was employed by Urban Retail Properties for nine years. After Urban fired her in 2004, Steadman sued, claiming that Urban fired her because of her religion, in violation of Title VII of the Civil Rights Act of 1964, *see* 42 U.S.C. § 2000e-2(a)(1). The district court granted summary judgment for Urban. We affirm.

The background to this dispute is largely straightforward. Urban, which develops and manages commercial real estate, hired Steadman as a secretary in 1995, but over the years she worked in various administrative-support positions. Her work at Urban was always satisfactory. In fact, in 2002 Steadman's supervisor evaluated her performance as "exceptional" and called her a "dedicated employee and a pleasure to work with." And

when 900 jobs at Urban were lost as the result of a takeover in May and June 2002, Steadman was the only member of her department retained by the company.

Steadman, although ethnically Jewish, is an atheist and has been throughout her employment with Urban. Steadman first complained to management about religious "harassment" in 1998. At that time she told Gail Silver, a long-term employee who by then had risen to the rank of Senior Vice President for Human Resources, about two incidents that occurred in 1995. The details are unclear, but one of the incidents involved a coworker loudly playing "religious music" at her desk.

In 1999, Steadman again complained about incidents that occurred three or four years before, all involving the same Jewish coworker. On one occasion this coworker remarked that she had attended a bar mitzvah and asked Steadman if she knew the rabbi who officiated, and may also have asked Steadman the name of her rabbi. On other occasions the woman talked about her rabbi or other religious events she had attended.

About six months later, Steadman complained for a third time. She said she had, at an undisclosed date, seen an incoming fax that, in her view, equated atheists with the devil. Steadman had made a photocopy, even though the fax was addressed to another employee, but she refused to provide the copy to Human Resources Manager Brian Alper. Steadman also reported that she had overheard one employee remark to another that "the church is beautiful." That comment, she suspected, had been intentionally timed so that she would hear it as she passed by. Finally, Steadman complained that several employees read Bibles in common areas during their lunch hour, although she conceded that no one had ever asked her to participate.

After that, Steadman said nothing more until February 2002 when she attached a note to her annual performance evaluation complaining that she was being forced to endure an "atmosphere of painful humiliation" and "hostility" concerning her "personal and private beliefs." When Steadman met with Alper to discuss her allegations, she reiterated complaints she had made before and added that she heard a receptionist say, "Who stole my Bible?" and that she overheard another coworker talk about her infant daughter named Grace. When asked what action she wanted the company to take, Steadman suggested a "cash settlement." Alper relayed that proposal to VP Silver, but the two of them concluded a payoff would not be appropriate because most of the alleged incidents had occurred years before and, at any rate, were innocuous.

In July 2002, just after the company was taken over, Sandy Cameron began sending Steadman and other employees religiously and sexually themed e-mails. Steadman received three religious e-mails in July 2002, one sexual e-mail in January 2003, one religious

e-mail in February 2003, and one sexual e-mail in August 2003. Steadman brought these e-mails to Alper's attention in October 2003, and Cameron was disciplined as a result.

But none of this background concerned Marie Hodorowicz, the coworker at the center of events leading up to Steadman's termination. Hodorowicz is openly religious. She often says things like, "God watches over" her, and she seeks to ward off "evil spirits" by wearing a particular necklace and sprinkling sea salt around her desk. Steadman assumed that "evil spirits" meant atheists, although Hodorowicz had never equated the two. Steadman was particularly offended that Hodorowicz inquired about the meaning of an atheist symbol on Steadman's necklace; Steadman believed that Hodorowicz knew what it was and was asking just to mock her.

On January 21, 2004, Steadman was working with Hodorowicz to copy a large number of documents. When Hodorowicz discovered that some of her work had already been done, she exclaimed, "God loves me." Steadman, angered, walked out of the room. Hodorowicz quickly apologized, and the two stepped into an empty office to discuss their differences. But after Steadman complained about her frequent religious references, Hodorowicz stormed out of the office, and later registered a complaint with VP Silver. Hodorowicz told Silver that Steadman had blocked the office door and made her feel threatened. Silver decided that she must investigate and intervene because Hodorowicz had reported feeling "physically threatened."

The next day VP Silver met with Steadman and asked for her version of the incident with Hodorowicz. Steadman instead began rehashing her past problems with Hodorowicz. Silver gave Steadman multiple opportunities to share her account of the incident, but each time Steadman refused. Steadman told Silver that she "should be ashamed" of how she was doing her job, that she did not care what Silver was saying, and that she did not want to listen to her "gibberish." Steadman ended the meeting by saying, "I'm done—you can fire me, you can do whatever you feel like doing—this is ridiculous and I'll be back tomorrow if you'd like."

Steadman called in sick for the next three days, but she was not disciplined as a result of her conduct at the meeting. When she did return to work, she sent Silver a full-page e-mail that devoted seven lines to the incident with Hodorowicz but otherwise focused on past problems with other employees and with the way Urban had handled her previous complaints.

After receiving this e-mail, Silver met with Steadman again. Steadman maintained that Hodorowicz was lying about feeling intimidated and said that she was upset because there was no basis for Hodorowicz's accusation. Silver told her that they must find a way

"to go forward" so that Steadman would be comfortable coming into work and not call in sick. Silver offered to mediate a discussion between Steadman and Hodorowicz so they could air their differences in a supervised setting, but Steadman declined. Instead, Steadman said she would like to see the matter dropped. Steadman and Silver agreed on the following course of action: Silver would talk to Hodorowicz and communicate Steadman's response to her complaint, and Silver would advise Hodorowicz, as she then advised Steadman, that from then on they should have only "cordial business interaction."

Silver did speak with Hodorowicz, who told her that Steadman's atheism makes "lots of people" "uncomfortable." Silver replied that Steadman "could say the same thing, lots of people make her feel uncomfortable with their religion." At this point, after having the discussion with Hodorowicz that she had promised Steadman would take place, Silver considered the January 21 incident closed.

Instead of dropping the matter, however, Steadman continued to complain. On February 4, 2004, she sent Silver a memorandum reiterating her belief that Hodorowicz had lied about feeling physically threatened and demanding that Hodorowicz "take responsibility for her lies." Steadman sent another memorandum to the same effect two days later on February 6. Silver met that day with the general counsel and the president of the company. The three were troubled that Steadman would not drop the matter, especially now a week after she had agreed to move forward, and they sensed that Steadman was unable to accept the company's resolution.

Later that day Silver again met with Steadman. Silver asked Steadman four times what Urban could do to resolve the situation, but got no answer. Silver concluded that Steadman was unable to accept that Hodorowicz had perceived the incident differently and complained, and that the company was not in a position to determine whose version of events was the truth. Silver felt that she was unable to resolve the past problems to Steadman's satisfaction, and that Steadman's unwillingness to move forward created an untenable situation. Although Silver had been leaning towards firing Steadman before the meeting, she made the final decision to do so at the meeting. Steadman promptly filed an EEOC charge claiming that her termination was religiously motivated. After receiving a right-to-sue letter, she filed this lawsuit.

At summary judgment, each party submitted a statement of material facts. *See* N.D. Ill. R. 56.1. Steadman admitted every paragraph in Urban's submission, including a representation that Silver had fired Steadman after concluding that the company could not satisfactorily resolve Steadman's problems and that her inability "to move forward" had caused an "untenable situation." At the same time however, Steadman represented in her own submission that Hodorowicz had previously admitted to Silver that she "made up" her

allegation of physical intimidation. If true, that fact would have undermined the credibility of Silver's explanation for firing Steadman, but Urban disputed Steadman's representation and maintained that there was no evidence to support it. The district court granted summary judgment for Urban, reasoning that Steadman had failed to provide enough evidence for a reasonable jury to find that she was fired because of her religious beliefs.

Steadman proceeded under the direct method of proof. Under that method, the plaintiff may rely on either direct or circumstantial evidence. *Nichols v. S. Ill. Univ.–Edwardsville*, 510 F.3d 772, 781 (7th Cir. 2007). "'Circumstantial evidence of discrimination is evidence which allows the trier of fact to infer intentional discrimination by the decisionmaker,'" *id.* (quoting *Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007)), and it is on circumstantial evidence that Steadman relied. What was required, then, was evidence from which a rational trier of fact could reasonably infer that Urban fired Steadman because she "was a member of a protected class." *Jennings v. Ill. Dep't of Corr.*, 496 F.3d 764, 767 (7th Cir. 2007). And atheism is a protected class for purposes of Title VII. *See Reed v. Great Lakes Cos.*, 330 F.3d 931, 933-34 (7th Cir. 2003). Although we have said a plaintiff may satisfy her burden under the direct method "by constructing a convincing mosaic of circumstantial evidence," *Phelan v. Cook County*, 463 F.3d 773, 779 (7th Cir. 2006), circumstantial evidence under the direct method need not have a mosaic-like character, *Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 903-04 (7th Cir. 2006).

Steadman first maintains that the district court applied an incorrect standard when it assessed her claim. In particular, she points to the district court's statement that "In asserting a claim for discriminatory discharge, Steadman must provide evidence from which it could be reasonably inferred that Silver (or perhaps someone else involved in the decision to terminate Steadman's employment) harbored a discriminatory animus toward atheists." Steadman argues that evidence of a discriminatory animus toward atheists in general is not necessary. However, Steadman's argument ignores the fact that the district court followed this statement with a particular analysis of whether a rational trier of fact could find that Urban fired her because she was an atheist. *See Jennings*, 496 F.3d at 767. Indeed, when a plaintiff proceeds under the direct method of proof, a plaintiff "must prove that the defendants were motivated by animus" based upon the protected characteristic. *Sun v. Bd. of Trustees of Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007).

We have recognized three forms of circumstantial evidence:

(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better

treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.

*Nichols*, 510 F.3d at 782. Steadman's case rests exclusively on suspicious timing. She contends that because Silver decided to fire her immediately after she had complained about the company's handling of her complaints about perceived religious harassment, coupled with the fact that she was a long-time, dedicated employee, a jury could reasonably infer that she was fired because of her religion. This argument must fail.

First, in her response to the company's statement of material facts, Steadman conceded her case away. Steadman expressly admitted Urban's contention that "Silver felt that she was unable to resolve the past problems to Plaintiff's satisfaction, and that because Plaintiff was unable to move forward, they had reached an untenable situation and it was best to sever the relationship between Plaintiff and Urban so Plaintiff was terminated." This concession is fatal to Steadman's case. She acknowledged that Silver's motivation for firing her was not her atheism, but rather that "they had reached an untenable situation" because Steadman "was unable to move forward." And since Steadman did not dispute that the reason Urban fired Steadman had nothing to do with her religion, the company is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Even apart from her concession, Steadman failed to adduce sufficient evidence from which a jury could reasonably infer that Urban discriminated against her on the basis of her religion. Steadman argues that a jury could infer that her atheism was the basis for her termination since Silver decided to fire her soon after she complained about how the company handled her complaints concerning her religion. But Urban had known for years that Steadman was an atheist, yet she had never been disciplined for complaining that coworkers were harassing her because of her religion, and she had received a positive performance review in the midst of her complaints. Indeed, a reasonable inference exists that Steadman was such a good employee that Urban took steps to resolve her dispute with Hodorowicz in Steadman's favor; Hodorowicz could rightly have complained that Urban failed to do enough when it learned of Steadman's threatening behavior. The uncontested evidence shows, not that the company reacted to Steadman's religion, but that it had fired Steadman after Hodorowicz complained that Steadman had let matters become physical. So the timing of Steadman's firing actually cuts against her.

Steadman would have a much stronger case if, as she represented at summary judgment, she was fired after Hodorowicz had recanted her claim that Steadman "physically intimidated" her. The only relevant distinction between the two women appears to be their religion, and, if this scenario was true, Silver would have fired Steadman

knowing that the accusation that the company was "unable to resolve" and that Steadman would not put behind her was entirely false. But the only evidence Steadman submitted to support her contention that Hodorowicz recanted is Silver's deposition, and the cited page of that deposition does not substantiate Steadman's factual representation, nor do the surrounding pages. Because the record does not support Steadman's assertion, her statement cannot form the basis of any *genuine* issue of disputed fact. *See* FED. R. CIV. P. 56(c); *Cichon v. Exelon Generation Co.*, 401 F.3d 803, 809 & n.8 (7th Cir. 2005) (noting unsupported factual assertions are insufficient to demonstrate existence of genuine issue of fact); *see also Vanasco v. Nat'l-Louis Univ.*, 137 F.3d 962, 965 (7th Cir. 1998) (noting that a dispute is "genuine" only if a reasonable jury could return a verdict for the non-moving party on the same record).

Circumstantial evidence sufficient to survive summary judgment requires significantly more that what Steadman submitted. For example, in *Paz v. Wauconda Healthcare & Rehabilitation Ctr., LLC*, 464 F.3d 659 (7th Cir. 2006), a national-origin and pregnancy discrimination case, we reversed an award of summary judgment where the plaintiff, a Mexican-American, had submitted evidence that her supervisor often made disparaging comments about Mexican-Americans; allowed white, but not Hispanic, employees to take long, frequent breaks; turned off the radio whenever it was tuned to a Spanish-language station; and after learning of the plaintiff's pregnancy told her every day to have an abortion. *Id.* at 661-62, 66. Similarly, in *Phelan*, 463 F.3d at 781-82, we reversed an award of summary judgment where the female plaintiff introduced evidence that she was body-slammed into a desk by two men, repeatedly placed in a headlock by another, told that her workplace was "no place for a woman," insulted when she complained, and prevented from taking medical leave to recuperate from being assaulted at work. *Id.* at 782.

The picture that emerges from the material undisputed facts shows that Steadman was fired because of her unwillingness to accept the company's handling of her repeated complaints about trivial matters that she escalated into a confrontation that left a fellow employee feeling physically threatened.

We therefore AFFIRM the judgment of the district court.