**Louis MARTONE**

v.

**JOHNSTON SCHOOL COMMITTEE.**

No. 2002–95–Appeal.

Supreme Court of Rhode Island.

June 3, 2003.

Gregory A. Carrara, Jeffrey D. Sowa, Richard A. Skolnik, Nicholas Trott Long, Providence, for Plaintiff.

Stephen Robinson, Providence, Michael Robinson, Newport, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, and GOLDBERG, JJ.

## OPINION

WILLIAMS, Chief Justice.

The defendant, Johnston School Committee (committee), appeals from a Superior Court judgment of mandamus, requiring it to provide a hearing to the plaintiff-teacher, Louis Martone (Martone), in accordance with G.L.1956 § 16–13–5.[1] For

---

1. Specifically, the order directed the Johnston School Committee (committee) to conduct a hearing in accordance with G.L.1956 §§ 16–13–4 and 16–13–5. Section 16–13–5 addresses suspensions, but incorporates by reference the procedural protections in § 16–13–4,

the reasons set forth herein, we sustain the committee's appeal and vacate the Superior Court judgment. The facts pertinent to this appeal are as follows.

# I

## Facts and Travel

Martone is a tenured teacher at Johnston High School. In a letter dated May 17, 2001, then-superintendent, Michael W. Jolin, Ph.D. (Jolin), informed Martone that he was being placed on "leave with pay * * * pending [an] investigation of matters of a confidential nature regarding [Martone's] professional conduct." Although the letter did not detail the reason for the suspension, the impetus behind Jolin's actions was an allegation that Martone had sexually harassed a fellow teacher.

On August 22, 2001, Jolin sent another letter to Martone, this time informing him that the Johnston School Department (department) had completed its investigation into the matter. The letter was entitled "Letter of Reprimand." According to Jolin, Martone admitted making the alleged harassing statements. Jolin further informed Martone that, although he may not have made the statement with malevolent intent, the language he used was "highly unprofessional and in violation of the [department's] Harassment Policy." Jolin also advised Martone that a copy of the letter of reprimand would remain in his permanent file pursuant to the Collective Bargaining Agreement (CBA) between the teachers' union and the committee. Nevertheless, Martone was permitted to resume his teaching duties contingent upon his completing a sexual harassment course.

On August 30, 2001, union representative Rita Kerwick Blythe (Blythe) filed a grievance with the committee on Martone's behalf. The grievance alleged that Jolin's August 22 letter was "issued without just cause." She also demanded that the letter be declared "null and void and expunged from any and all records." Pursuant to Article II, § 3 of the CBA, a teacher's grievance should be directed first to the teacher's principal or supervisor, then to the superintendent, the school committee and finally, to an arbitrator. Blythe requested that the grievance "proceed directly to the school committee level" and be heard during the executive session of the next meeting. The committee agreed to hear the grievance at its next meeting, which was scheduled for September 11, 2001. Because of the terrorist attacks on our country, the committee rescheduled the meeting and hearing on Martone's grievance. Since that time, the committee twice has continued the hearing at Martone's request. For reasons that are not clear from the record, the committee has not yet heard Martone's grievance.

On November 27, 2001, Martone filed a petition for a writ of mandamus in Superior Court, seeking to force the committee to conduct a hearing pursuant to § 16–13–5. Thereafter, the committee filed a motion to dismiss, arguing that Martone never had been "suspended," and therefore he was not entitled to a hearing pursuant to § 16–13–5. The committee further argued that, because Martone first had elected to invoke the contractual grievance process, the election of remedies doctrine precluded him from requesting a § 16–13–5 hearing.

At the mandamus hearing, the hearing justice discussed the election of remedies doctrine in general, but he did not resolve that issue. Rather, he concluded that Martone had been suspended according to

which governs dismissals. Because this case involves an alleged suspension, we refer to

the issuance of a writ of mandamus as requiring a hearing under § 16–13–5.

§ 16–13–5 and that he was entitled to a hearing pursuant to that section. Accordingly, he denied the committee's motion to dismiss, issued the writ and stayed the imposition of any further disciplinary action for Martone's failure to complete the sexual harassment training pending the outcome of the hearing. The committee timely appealed. The Rhode Island Association of School Committees and the Rhode Island Federation of Teachers and Health Professionals filed amicus memoranda to support the committee's argument that Martone had not been suspended.

## II

### Analysis

This Court has clearly outlined the requirements for issuing a writ of mandamus.

"A writ of mandamus should issue only when (1) the party petitioning for such an extraordinary remedy has shown a clear legal right to obtain the relief sought by the writ; (2) the respondent(s) has a ministerial legal duty to perform the requested act without discretion to refuse; and (3) the petitioner possesses no adequate remedy at law." *P.J.C. Realty, Inc. v. Barry,* 811 A.2d 1202, 1205 (R.I.2002) (quoting *Providence Teachers Union Local 958 v. Providence School Board,* 748 A.2d 270, 272 (R.I.2000)).

Once these prerequisites have been shown, it is within the sound discretion of the Superior Court justice to ultimately issue the writ. *See Wood v. Lussier,* 416 A.2d 690, 693 (R.I.1980). In this case, Martone does not have a clear legal right to a § 16–13–5 hearing because he initially elected to challenge the sanctions imposed against him through the CBA grievance process.

### A

### Election of Remedies

This Court long has adhered to the election of remedies doctrine to "mitigate unfairness to both parties by preventing double redress for a single wrong." *State Department of Environmental Management v. State Labor Relations Board,* 799 A.2d 274, 277 (R.I.2002) (*DEM*). Pursuant to the election of remedies doctrine, "when one party to a CBA attempts to take advantage of the grievance procedure and loses, * * * that party [is prohibited] from pursuing the same dispute in the courts of this state." *Id.* at 278 (quoting *Cipolla v. Rhode Island College Board of Governors for Higher Education,* 742 A.2d 277, 281 (R.I.1999)). Similarly, "when one party to a CBA attempts to take advantage of a statutorily-prescribed administrative remedy and loses, the election-of-remedies doctrine prohibits that party from pursuing the same dispute through a grievance procedure." *School Committee of North Kingstown v. Crouch,* 808 A.2d 1074, 1080 (R.I.2002).

Recently, this Court reaffirmed the force and breadth of the election of remedies doctrine in *DEM. DEM,* 799 A.2d at 278. In that case, DEM employees learned that DEM was posting a part-time job opening for a "principal forester." *Id.* at 276. The employees' union contended that the posting violated its CBA with DEM. *Id.* The union then filed a grievance with DEM pursuant to the CBA requesting that the posting be lifted and that DEM create an opening for a full-time position. *Id.* After DEM rejected its request, the union appealed to the Department of Administration's Office of Labor Relations, which also denied the union's request. *Id.* Pursuant to the CBA's grievance procedures, the union could further pursue the matter only through binding arbitration. *Id.* At that point, however,

the union complained to the state Labor Relations Board, which heard the case pursuant to G.L.1956 § 28–7–9(b)(5). *DEM*, 799 A.2d at 276. The board ultimately granted a cease-and-desist order forbidding DEM to create the part-time position. *Id.* at 279. This Court held that the matter was improperly before the board because, by first initiating the grievance process, the union had selected its remedy and "should have pursued that remedy to its conclusion." *Id.* at 278 (quoting *Cipolla*, 742 A.2d at 282).

■ In this case, the parties agree that Martone is entitled to a hearing before the committee. However, the appeals process would be markedly different if the committee were hearing a case pursuant to the grievance process or § 16–13–5. According to the CBA, a grievance heard by the committee may only be appealed through the arbitration process. Conversely, the committee's decision after a § 16–13–5 hearing may only be appealed to the Department of Secondary Education or Elementary Education and then to the Superior Court. *See* § 16–13–4. Thus, the remedy elected by Martone is of great significance.

■ On August 30, 2001, Martone filed a grievance pursuant to the CBA. Thereafter, on November 27, 2001, he petitioned the Superior Court for a writ of mandamus demanding that the committee provide him a hearing pursuant to § 16–13–5.[2] By initially electing to use the grievance process to challenge the sanction that the committee imposed against him, Martone "had

selected the remedy to adjudicate [his] claim, and [he] should have pursued that remedy to its conclusion." *DEM*, 799 A.2d at 278 (quoting *Cipolla*, 742 A.2d at 282). Accordingly, pursuant to the election of remedies doctrine, Martone is not entitled to a § 16–13–5 hearing.

■ Martone contends that the election of remedies doctrine does not apply to this case because his grievance and demand for a § 16–13–5 hearing were designed to challenge different actions taken by the committee. Specifically, he contends that he attempted to nullify the letter of reprimand from his employment file through the grievance process. Conversely, he argues that he demanded a § 16–13–5 hearing to review the "suspension" imposed against him in Jolin's June 25 letter. However, as described in *DEM*, "the doctrine of election of remedies is equitable in nature and has at its core the salient purpose of preventing unfairness to the parties." *DEM*, 799 A.2d at 278. We believe that the remedies Martone sought through his grievance and request for a § 16–13–5 hearing are sufficiently similar to trigger the equitable doctrine of election of remedies. Like the resolution of the union's claim in *DEM*, the propriety of the sanctions imposed against Martone depends on the same underlying factual allegation—Martone's allegedly harassing statement. Accordingly, we conclude that it would be unfair to force the committee into duplicative litigation to defend its actions. Because Martone's and the committee's ac-

---

**2.** We do note that Martone has appended to his brief a letter to the committee dated June 25, 2001, in which he demanded a hearing pursuant to § 16–13–5. That letter, however, neither appears in the Superior Court record nor was it discussed during the hearing on Martone's petition for mandamus. Although at that hearing, Martone's counsel referred to the fact that he demanded a § 16–13–5 hear-

ing before filing his grievance, he never specified when that demand was made. Although we have no reason to question the authenticity of the June 25 letter, Martone simply has failed to lay the proper evidentiary foundation for any court to consider it. Accordingly, we cannot base our decision on this "evidence." *See State v. Thomas*, 794 A.2d 990, 992 n. 2 (R.I.2002).

tions would be considered whether the appeal were heard pursuant to § 16–13–5 or Martone's grievance, we are satisfied that the election of remedies doctrine applies and is dispositive.

## B

### Suspension

■ Even if Martone initially had elected to pursue his statutory remedy by invoking § 16–13–5, he was not entitled to a hearing pursuant to that statute because the committee had not "suspended" him. Section 16–13–5, by its own terms, applies only to cases of suspension. According to § 16–13–5(a), the committee must provide a pre-suspension hearing before suspending a teacher. If, however, the teacher has not been allowed to perform his or her duties before the pre-suspension hearing, the teacher shall be paid full salary during that time. *Id.* Once the committee has decided to suspend a teacher, it must provide the teacher with the reasons for its decision. Section 16–13–5(b). Further, upon request, the teacher has a right to a full hearing on the matter before the entire school board. Section 16–13–4. If the teacher ultimately is vindicated, the teacher shall be paid for the period of suspension. Section 16–13–5(b).

The term "suspension" is not defined in the statute. This Court has not had, until this case, the opportunity to provide the definition. Thus, we must employ our well-known canons of statutory interpretation to offer the meaning of the term.

■ This Court, as the final arbiter of law, conducts a *de novo* review of a Superior Court justice's interpretation of a statute. *See Stebbins v. Wells*, 818 A.2d

711, 715 (R.I.2003). When interpreting a statute, our ultimate goal is to give effect to the General Assembly's intent. *Id.* The best evidence of such intent can be found in the plain language used in the statute. Thus, a clear and unambiguous statute will be literally construed. *See id.* If, however, we are given the task of interpreting a statute that is susceptible to more than one interpretation, the construction given by the agency charged with its enforcement is entitled to weight and deference as long as that construction is not clearly erroneous and unauthorized. *See Asadoorian v. Warwick School Committee*, 691 A.2d 573, 578 (R.I.1997).

The Commissioner of Education (commissioner) has a duty to interpret laws affecting this state's schools. *See id.* For example, the commissioner expressed his views on the definition of suspension in *Coyle v. Providence School Board*, Commissioner of Education (April 29, 2002). In that case, teacher Janet Coyle (Coyle) was informed by letter that she was being temporarily removed from her nonteaching assignment with the Providence school system.[3] The letter informed her that her status would be treated "similar to a suspension with pay." No explanation for the action was provided except that her status would remain until the "pending matter [was] resolved." Coyle asserted that her "suspension" was imposed in violation of § 16–13–5 because she neither was presented with the reasons for her suspension nor provided a hearing before the Providence School Board. The commissioner, however, concluded that the § 16–13–5 hearing and notification requirements were not triggered because Coyle had not been "suspended." According to the com-

---

**3.** Although the commissioner's decision does not specify the reason for the action taken against Coyle, it appears that it stemmed from an allegation that she assaulted a student.

According to the decision, Coyle eventually was tried and acquitted of that charge in District Court.

missioner, "[a]lthough she was instructed not to report to work, Ms. Coyle received the concurrent notice that she would be paid her salary. Based on these facts, * * * she was not 'suspended' within the meaning of [§ ] 16–13–5."

Although § 16–13–5 implies that a teacher may be "suspended" with pay, the commissioner's interpretation in *Coyle* was not inconsistent with the term "suspended." The only intimation that payment is irrelevant for defining the term comes in § 16–13–5(a), which provides: "[i]n the event a teacher is suspended or otherwise not permitted to perform his or her duties prior to the presuspension hearing, then the teacher shall be paid his or her regular salary during that period," (payment provision). The requirement that a suspended teacher be paid for the time before a pre-suspension hearing appears to conflict with the commissioner's conclusion in *Coyle*. However, the sentence directly preceding the payment provision says: "*[p]rior* to the suspension of a teacher * * * the school committee *shall hold* a pre-suspension hearing * * *,*" (pre-suspension hearing provision). *Id.* (Emphasis added.) These two provisions are conflicting. The payment provision's reference to a teacher as being suspended before a pre-suspension hearing defies logic when a suspension cannot be imposed without such a hearing.

■■■■ "[W]hen apparently inconsistent statutory provisions are questioned, every attempt should be made to construe and apply them so as to avoid the inconsistency * * *." *Brennan v. Kirby*, 529 A.2d 633, 637 (R.I.1987). Any reliance on the payment provision for the proposition that a teacher can be "suspended" with pay is

misplaced. Such an interpretation would ignore the prohibition against suspending a teacher without first conducting a pre-suspension hearing. Thus, to read these provisions harmoniously, we conclude that the payment provision does not apply to a "suspension." Rather, that provision merely ensures a teacher's right to continue to collect pay before he or she is in fact suspended; it does not help define the term suspension.

■■■■ Martone relies on the length of time that he was displaced from work to support his claim that he was suspended. According to Martone, the committee cannot deny a teacher the opportunity to carry out his duties for an·extended period without providing a statement of cause or a hearing. Although that position may be addressed by a collective bargaining agreement, it is simply unsupported by § 16–13–5. A determination that a teacher has been suspended does not depend on the length of time that the leave is imposed. If an individual continues to be paid during the period in question, he or she has not been suspended. Even a constructive suspension requires that an individual be denied pay during the period in question. *See Perez v. Merit Systems Protection Board*, 931 F.2d 853, 855 (Fed. Cir.1991) (defining constructive suspension as certain personnel actions that result in an employee's loss of duties and pay).

■■■■ We cannot say that the commissioner's interpretation is erroneous. Indeed, his interpretation is in accord with the definition of the term suspension as it relates to adverse employment actions taken against federal employees. In 5 U.S.C. § 7501(2), the term suspension is defined

as "the placing of an employee, for disciplinary reasons, in a temporary status without duties and pay." We believe this definition of the term "suspension" clearly reflects the commissioner's decision in *Coyle* and we adopt it as the definition of the term "suspension" as it is used in § 16–13–5.

We are not concerned that school administrators will be inclined to abuse our conclusion. As long as the teacher continues to collect full pay during the period of administrative leave while an investigation into an allegation of misconduct is pending, we are confident that there is sufficient incentive to quickly move past the investigatory stages and either reinstate the teacher's duties or take other appropriate action. The use of paid administrative leave provides a reasonable means of immediately neutralizing a potentially contentious situation while minimally affecting the teacher. Although the better practice may be to provide tenured teachers with notice of the reasons why he or she is being placed on administrative leave, § 16–13–5 does not require it.

Applying our definition of suspension to the facts at bar, it is clear that Martone was not suspended for purposes of § 16–13–5. It is undisputed that he was paid for the entire time he was displaced. Accordingly, Martone was not entitled to the procedural protections outlined in § 16–13–5 when he was placed on administrative leave. Thus, Martone is not entitled to the statutory remedy he seeks, and the issuance of a writ of mandamus is inappropriate.

## Conclusion

For the foregoing reasons, the committee's appeal is sustained. The judgment of the Superior Court is vacated. The papers of the case may be returned to the Superior Court.

Justice FLAHERTY did not participate.