**Supreme Court**

No. 2011-360-Appeal.
(PC 02-2214)

| | |
|---|---|
| Peter W. Russo | : |
| v. | : |
| State of Rhode Island, Department of Mental Health, Retardation and Hospitals et al. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Peter W. Russo           :

v.                 :

State of Rhode Island, Department of   :
Mental Health, Retardation and Hospitals
et al.

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

# O P I N I O N

**Justice Robinson, for the Court.**  The defendant, the Rhode Island Department of Mental Health, Retardation and Hospitals (MHRH),[1] appeals from a judgment of the Superior Court that was entered on November 8, 2010, following a bench trial.  The trial justice found in favor of Peter W. Russo, the plaintiff, holding that the MHRH had violated the Rhode Island Whistleblowers' Protection Act (WPA), as codified in G.L. 1956 §§ 28-50-1 to -9, when it placed the plaintiff on administrative leave with pay and required that he undergo an independent medical examination (IME).  The MHRH contends that the trial justice erred in finding: (1) that placing the plaintiff on paid administrative leave and requiring him to undergo an IME

---

[1]  In 2010, the Rhode Island General Assembly changed the name of the MHRH to the Department of Behavioral Healthcare, Developmental Disabilities and Hospitals.  See G.L. 1956 § 40.1-1-3.1, as enacted by P.L. 2010, ch. 101, § 2.  We refer to the MHRH as it was titled at both the time of the events at issue in this case and at the time plaintiff's original complaint was filed.

constituted a "discharge, threat[], or * * * discriminat[ion]" under the WPA; (2) that the plaintiff had reported violations of a "law or regulation or rule promulgated under the law of [Rhode Island]" (which is one of the preconditions for obtaining relief under the WPA); (3) that there was a causal connection between the plaintiff's reports at issue in the case and his placement on paid administrative leave; and (4) that the MHRH did not have "legitimate non-retaliatory" grounds to place the plaintiff on paid administrative leave and require that he undergo an IME.

For the reasons set forth in this opinion, we vacate the judgment of the Superior Court in favor of plaintiff.

# I

## Facts and Travel

On April 29, 2002, Mr. Russo, a state employee, filed a complaint in the Providence County Superior Court against the MHRH, in which he alleged that the MHRH violated the WPA when, in the words of the complaint, it "discriminated against [him] because he reported what he reasonably believed to be violations of laws, rules and/or regulations of the laws of [Rhode Island]" by "requiring [that he] take an administrative leave and * * * attend psychiatric treatment * * * ."[2] A bench trial was held over five days in October and November of 2010. We summarize below the relevant testimony elicited at that trial.

---

[2] The plaintiff's complaint also included other counts and named other defendants in addition to the MHRH. At the time of trial, however, the only remaining count was the one alleging violation of the WPA, and the only remaining defendant was the MHRH. The MHRH's alleged violation of the WPA is the focus of this appeal.

# A

## The Trial Testimony

Mr. Russo testified that, during the portions of 2000 and 2001 at issue in the case, he was working for the State of Rhode Island as a housekeeper stationed at the Highview Building.[3] He further testified that he had been stationed at the Highview Building since August of 1999 and that he worked the 1:00 p.m. to 9:30 p.m. shift. It was his testimony that on, May 11, 2000, he observed another employee, Nancy Palazzo, put a state-owned vacuum cleaner in her personal vehicle and then drive away. According to plaintiff's testimony about the vacuum cleaner, when he "went to the closet where it was stored * * * it was gone." He indicated in his testimony that the next day he sent a letter to Steven Strate, who was the acting Administrator of Support Services and also was plaintiff's supervisor. The plaintiff testified that in the May 12, 2000 letter he reported that the vacuum cleaner was missing; the letter (which plaintiff read into the record at trial) reads in pertinent part as follows:

> "On Thursday night [May 11] the vacuum cleaner was not in the
> downstairs closet that it was supposed to be in. On Friday, May 12,
> I asked * * * Nancy Palazzo[] where the vacuum cleaner was. She
> told me that the vacuum cleaner was locked up."

Mr. Strate testified that, in addition to what he said in the letter, Mr. Russo verbally reported the missing vacuum cleaner to him and told him that Ms. Palazzo had taken it. Mr. Strate also testified that he brought plaintiff's allegation with respect to the vacuum cleaner to

---

[3]     In his testimony at trial, Mr. Russo stated that he was "stationed at * * * [the] Highview day site." Nancy Palazzo, who, according to her testimony (see infra), worked as a "coordinator for residential services" in 2000 and 2001, referred to the building in which she and Mr. Russo worked as the "Highview day site center in Hope Valley." We shall hereinafter refer to the site simply as the "Highview Building."

the attention of Richard Gill, a "unit manager" with offices located in the Highview Building,[4] who told him that he had taken the vacuum cleaner for "his unit;" he added that Mr. Gill said that it "belonged to the unit." Mr. Strate stated during his testimony that he passed this information on to plaintiff within "probably days" of plaintiff's complaint. By contrast, it was plaintiff's testimony that the vacuum cleaner was not returned to the Highview Building until August of 2000, at which time it was locked up in Mr. Gill's office.

It was plaintiff's further testimony that certain employees were bringing their dogs to work and that he took issue with the presence of the dogs in the workplace because he was being "blame[d]" for the deleterious effect of the dogs' activities on the cleanliness of the building. He testified that he made verbal complaints about the dogs to Mr. Gill in August of 1999 and discussed the issue with respect to the dogs in the workplace with Mr. Strate in February of 2000; he added that he sent a letter to Mr. Gill on September 8, 2000, which specifically requested that dogs no longer be allowed in the Highview Building. According to Mr. Russo's testimony he also made additional complaints to Mr. Strate regarding the dogs in the workplace.

On October 13, 2000, Gerald Clancy,[5] an official within the MHRH,[6] issued a memorandum with respect to pets at work; that memorandum reads as follows:

---

[4]     Mr. Gill did not testify at trial; however, his deposition was read into the record at trial and entered as an exhibit. With respect to his position with the state during the time period at issue in this case, Mr. Gill testified that he was not "exactly sure of the title" of his position, but he added that he "was what they called a unit manager, the unit manager." He further testified that as a "unit manager" his responsibilities included being "in charge of" eighteen state-run facilities for the developmentally disabled; he added that his office was located in the Highview Building. Additionally, he testified that he was not Mr. Russo's "direct supervisor," but, according to Mr. Gill's testimony, since Mr. Russo was "the only maintenance guy in the area, [he] would have occasion to ask [Mr. Russo] to get something done because that is just, that was the nature of the job."

[5]     Mr. Clancy did not testify at trial; however, his deposition was read into the record at trial and entered as an exhibit.

> "Effective immediately, no employee is allowed to have their personal pets at work. There is to be <u>no exception</u> to this directive. Managers and supervisors are to take notice and correct all breaches of this order."[7] (Emphasis in original.)

The plaintiff stated in his testimony that, after that memorandum was issued, he made reports about employees who continued to bring their dogs to work; he stated that he made those reports to Mr. Strate and that he did so in writing.

As is clear from the several documentary exhibits entered into evidence at trial, after the October 13 memorandum was issued, plaintiff was the subject of numerous complaints that were made to supervisors by other employees at the Highview Building. Those complaints referenced both the allegedly subpar quality of plaintiff's work as well as problems with his behavior in the workplace. According to plaintiff's testimony at trial, as a result of his reports of dogs having been brought to the workplace, he was threatened by another employee's husband (who was also a state employee), subjected to "snide remarks," and had a flea collar left in his mailbox; plaintiff stated, with reference to the other employees working in the Highview Building: "They were harassing me for reporting the pets." It is important also to note that Mr. Strate testified that complaints about Mr. Russo's cleaning had been "going on for years," and Mr. Russo acknowledged on cross-examination that there had been two complaints (one of which was made by Ms. Palazzo) about his job performance in September of 2000—<u>i.e.</u>, before the issuance of Mr. Clancy's memorandum prohibiting pets in the workplace.

---

[6]     Mr. Clancy testified that his responsibility as an "associate director" of the MHRH was to act as "director of the * * * Rhode Island Community Living and Supports."

[7]     According to Mr. Clancy's testimony, the above-referenced memorandum was not issued in "direct response to Mr. Russo's complaints." Rather, Mr. Clancy testified that issuing the memorandum was motivated by his "history of disliking dogs in the workplace," which "culminated" in a specific incident of uncleanliness resulting from pets being permitted in the workplace; Mr. Clancy added that he issued the memorandum "shortly" after that particular incident.

The plaintiff testified that, after the numerous above-referenced complaints were lodged, he attended a meeting with Mr. Clancy and Kathryn Sherman (a risk manager employed by the state) on November 9, 2000. It was his further testimony that he told Mr. Clancy and Ms. Sherman that he was at the meeting to "report a theft;" he also acknowledged that he told them that he felt he was being retaliated against for his report of the vacuum cleaner "theft" and for his complaints about the presence of dogs in the building. On January 19, 2001, according to Mr. Russo's testimony, he attended another meeting—this time involving Ms. Sherman, Mr. Clancy, Mr. Strate, and two union stewards—at which Mr. Clancy told him that his "job was safe," but that he was "[r]equired" to "go to" the Employee Assistance Program (EAP). Mr. Russo added that he was told that, although "it wasn't [his] problem," there was an issue at the Highview Building that the management staff was "trying to get to the bottom of * * * ." Mr. Russo testified that he was told that he was "being taken out of work at [that] point in time." He further testified that, following the January 19, 2001 meeting, he met with an individual from the EAP who told him that he would be required to undergo an IME and that an appointment for that purpose had already been arranged. When questioned at trial as to whether he was told that he would be off work until he participated in the IME, Mr. Russo stated: "They said we think you need a break to take care of it;" he added that it was his "understanding [that he wasn't] going to be allowed to work * * * ."

The plaintiff testified that, after being placed on paid administrative leave, he hired an attorney because his "job was on the line." He stated that he did not attend the scheduled IME but went instead to a doctor whom his lawyer recommended. Mr. Russo indicated at trial that this doctor approved his return to work, and he said that he ultimately resumed his duties at the Highview Building on March 14, 2001. At trial, the following stipulation was read into the

record: "[P]laintiff * * * was placed on paid administrative leave from January 19, 2001 until his return to work on March 14, 2001, and * * * received his full salary, including a shift differential while he was out of work on administrative leave."

Ms. Sherman testified at trial and corroborated Mr. Russo's testimony as to his having been placed on paid administrative leave on January 19, 2001 and having been referred to the EAP for an IME. With respect to the EAP and the IME, Ms. Sherman was asked the following question at trial: "If he refused to go, what would have happened to him, he would have been placed out on administrative leave anyway, right?" Her response was: "He would not have been. There was not, if you're asking me whether or not I would have disciplined him, it was not disciplinary." Mr. Clancy's testimony at his deposition was in line with Ms. Sherman's testimony at trial; he stated that Mr. Russo's "[administrative] leave was not discipline." Ms. Sherman was later asked, during her testimony at trial, whether Mr. Russo would have been allowed to return to work if he had not been evaluated by a doctor; and she replied that, if an employee refused to comply with an IME requirement, it would be handled on a "case-by-case basis." Ms. Sherman added that, "if an employee is required to go [and does not do so], there[sic] could result in disciplinary action."

**B**

**The Superior Court's Decision**

The trial justice rendered a decision from the bench on November 8, 2010. He ruled that plaintiff had established a prima facie case against the MHRH, finding "that the reporting by Mr. Russo of the alleged theft, which was never really appropriately responded to by the State, and his reporting of the canines coming into the office in rather large numbers, is sufficient to get over the tenets of the statute by reporting what he believed to be violations of statutes and/or

- 7 -

regulations." The trial justice recognized that plaintiff "marched to a different drummer," but he also found him to otherwise be "an extremely credible, conscientious State employee trying to do his job * * * ."

With respect to the complaints by other employees about Mr. Russo, the trial justice found them to be retaliatory and inflated; the trial justice found as follows:

> "I find as a fact that all of the State's witnesses, Ms. Palazzo, Ms. Farrow * * * the other women that were involved in making these complaints against him were exaggerated. Ms. Palazzo was afraid to be in the building with him. Well, what did he do? Well, he walked by me in the darkened hallway. Did he say anything to you? No. Did he look at you? No, he didn't even look at me. Give me a break; she obviously, in my view, was upset by the fact that Mr. Russo complained that she had stolen a vacuum cleaner."

The trial justice proceeded to find that two of the several complaints made by other employees against Mr. Russo (which complaints the trial justice did not identify with specificity) were more than exaggerated; he stated that those two complaints were "patently, absolutely false, probably defamatory, and completely made up of whole cloth to destroy [Mr. Russo's] reputation." According to the trial justice, management turned a "complete blind eye to the retaliatory aspect of the actions of [Mr. Russo's] co-workers * * * ." In addition, it was the trial justice's further finding that the entire management staff "swallowed, hook, line and sinker" a particular complaint regarding statements allegedly made by Mr. Russo during a conversation about a then-recent workplace shooting in Wakefield, Massachusetts. [8] As Ms. Sherman

---

[8] On December 26, 2000, in Wakefield, Massachusetts, Michael McDermott, a software tester at an Internet consulting company, shot and killed seven of his co-workers. He was later convicted on seven counts of first-degree murder. See Carey Goldberg, 7 Die in Rampage at Company; Co-Worker of Victims Arrested, http://www.nytimes.com/2000/12/27/us/7-die-in-rampage-at-company-co-worker-of-victims-arrested.html?ref=michaelmcdermott (last visited March 20, 2014); Man Convicted of Killing 7 Co-Workers, http://www.nytimes.com/2002/04/25/us/man-convicted-of-killing-7-co-workers.html?ref=michaelmcdermott (last visited March 20, 2014).

acknowledged in her testimony, it was ultimately determined after an investigation that Mr. Russo had been falsely accused of making those statements.

With regard, specifically, to Mr. Russo's having been placed on paid administrative leave and having been required to undergo an IME, the trial justice stated:

> "Now Mr. Russo, whatever else he may be, is not stupid and he said, What are you doing this to me for? I don't need to be examined by some psychiatrist; there's nothing the matter with me. * * * He hired his own lawyer, went to, I assume went to an accredited psychiatrist, because there's been no indication by the defense in this matter that there was anything the matter with that person's credentials, and that doctor said there's nothing the matter with him.
>
> "So what do they do? They put him back to work. Granted, they paid him for all the time he was out, they paid him his differential from working the evening shift * * *. But nonetheless they completely disregarded the slanderous, contemptuous, and extreme complaints made by these people against this man because of the complaints that he made about the stealing of the vacuum cleaner and the dogs' presence in the building. And their response [to the complaints regarding Mr. Russo], was inordinate and contemptuous, that educated people working in a social service agency dealing with challenged individuals would not have exhibited more sensitivity to a person that they should have known or did know was slightly different than the way they conducted their activities. And I think it's a shame. I really think it's a shame."

Ultimately, the trial justice concluded that plaintiff had proven his case by clear and convincing evidence, and he awarded damages in the amount of $5,000 (the fee charged by the attorney whom Mr. Russo hired while on paid administrative leave) plus $1,000 (as compensation for what the trial justice characterizes as plaintiff's "emotional pain and

---

According to Ms. Sherman's testimony at trial, an employee in the Highview Building reported that a co-worker had overheard an exchange between a fellow employee and Mr. Russo regarding the Wakefield shooting. Ms. Sherman's testimony was as follows: "[A]n employee said to Mr. Russo, 'You're not going to go postal on us, are you?['] * * * Mr. Russo replied, 'You will be the first.'"

suffering);" he also awarded reasonable attorneys' fees (in an amount to be determined at a later date) with respect to legal services rendered in connection with the instant case.

## II

### Standard of Review

We apply a deferential standard of review to "the factual findings of a trial justice sitting without a jury." Pelletier v. Laureanno, 46 A.3d 28, 35 (R.I. 2012); see also Houde v. State, 973 A.2d 493, 498 (R.I. 2009); 1800 Smith Street Associates, LP v. Gencarelli, 888 A.2d 46, 54 (R.I. 2005) ("When reviewing findings of fact by a trial justice in a nonjury case, we apply a deferential standard of review.") (internal quotation marks omitted). Consequently, we will not disturb a trial justice's factual findings or credibility determinations unless they are "clearly erroneous or * * * the trial justice misconceived or overlooked material evidence or * * * the decision fails to do substantial justice between the parties." Cahill v. Morrow, 11 A.3d 82, 86 (R.I. 2011) (internal quotation marks omitted); Dowdell v. Bloomquist, 847 A.2d 827, 830 (R.I. 2004); see also Greensleeves, Inc. v. Smiley, 68 A.3d 425, 433-34 (R.I. 2013); Grady v. Narragansett Electric Co., 962 A.2d 34, 41 (R.I. 2009). If, upon review, "the record before us indicates that competent evidence supports the [trial] justice's findings, we shall not substitute our view of the evidence for his [or hers] even though a contrary conclusion could have been reached." Greensleeves, Inc., 68 A.3d at 434 (internal quotation marks omitted). We similarly afford deference to a trial justice's "'resolution of mixed questions of law and fact, as well as the inferences and conclusions drawn from the testimony and evidence * * * .'" Nye v. Brousseau, 992 A.2d 1002, 1008 (R.I. 2010) (quoting Houde, 973 A.2d at 498); see also Haviland v. Simmons, 45 A.3d 1246, 1256 (R.I. 2012).

In contrast, we conduct a de novo review of a trial justice's "conclusions of law." State

v. Gianquitti, 22 A.3d 1161, 1165 (R.I. 2011); Grady, 962 A.2d at 41; Rhode Island Depositors Economic Protection Corp. v. Bowen Court Associates, 763 A.2d 1005, 1007 (R.I. 2001). We similarly conduct a de novo review of questions of statutory construction. Silva v. Fitzpatrick, 913 A.2d 1060, 1063 (R.I. 2007); see also Bowen Court Associates, 763 A.3d at 1007; Webster v. Perrotta, 774 A.2d 68, 75 (R.I. 2001). Moreover, when construing a statute, it is our responsibility to effectuate the intent of the General Assembly. State v. Badessa, 869 A.2d 61, 65 (R.I. 2005). The General Assembly's "intent is discovered from an examination of the language, nature, and object of the statute." Ryan v. City of Providence, 11 A.3d 68, 71 (R.I. 2011) (internal quotation marks omitted).

## III

### Analysis

The MHRH's first contention is that the trial justice erred when he determined that placing Mr. Russo on paid administrative leave with the requirement that he undergo an IME was an employment action which fell within the scope of the WPA. We begin, and ultimately end, our analysis by addressing that contention.

The WPA reads in pertinent part as follows:

> "An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment:
> "(1) Because the employee, or a person acting on behalf of the employee, reports or is about to report to a public body, verbally or in writing, a violation which the employee knows or reasonably believes has occurred or is about to occur, of a law or regulation or rule promulgated under the law of this state, a political subdivision of this state, or the United States, unless the employee knows or has reason to know that the report is false * * * ." Section 28-50-3(1) (emphasis added).

The MHRH argues that the trial justice committed a "clear error of law" when he determined that the MHRH had violated the WPA. The defendant submits that it did not "discharge, threaten, or otherwise discriminate" against Mr. Russo when it placed him on administrative leave because: (1) during his leave, he received full pay, including his shift differential; and (2) when he returned to work, there was no change with respect to his pay, job assignment, or "any other condition of his employment." It is the MHRH's contention that placing plaintiff on paid administrative leave, even accompanied by the requirement that he undergo an IME, simply did not qualify as an adverse employment decision under the relevant case law. The plaintiff responds by contending that the trial justice's decision was not in error, and he relies on the provision of the WPA, which states that a civil action can be brought under the WPA seeking injunctive relief or actual damages. See § 28-50-4(a) ("A person who alleges a violation of this act may bring a civil action for appropriate injunctive relief, or actual damages, or both within three (3) years after the occurrence of the alleged violation of this chapter."). Mr. Russo further contends that he sustained a loss as a result of the MHRH's alleged violation of the WPA because: (1) it was necessary that he hire an attorney to participate in negotiations regarding his IME and his return to work; and (2) the actions of the MHRH subjected him to anxiety and emotional trauma.

We are in agreement with the contention of the MHRH that the trial justice's determination that the MHRH violated the WPA by placing Mr. Russo on administrative leave with pay constituted a ruling of law; therefore, in accordance with our usual standard of review in such a situation, we shall review that ruling in a de novo manner. See, e.g., Gianquitti, 22 A.3d at 1165; Grady, 962 A.2d at 41.

We have not previously had occasion to address whether placing an employee on paid administrative leave with the requirement that the employee undergo an IME is the equivalent of the employer having "discharge[d], threaten[ed], or * * * discriminate[d]" against the employee in violation of the WPA. However, our decision in Martone v. Johnston School Committee, 824 A.2d 426 (R.I. 2003) provides helpful contextual guidance. In Martone, we addressed the issue of how to define a "suspension" under G.L. 1956 § 16-13-5. Martone, 824 A.2d at 428-29. In that case, a tenured teacher at Johnston High School was informed that he was being placed on leave with pay pending an investigation regarding his professional conduct. Id. at 428. Upon completion of the investigation, approximately three months after the teacher was placed on leave, a "Letter of Reprimand" was placed in his permanent file, but he was permitted to return to his teaching duties. Id. The case came before this Court on an appeal from a judgment of mandamus issued by the Superior Court, whereby the Johnston School Committee was ordered to conduct a hearing because, in the view of the trial justice, the teacher had been "suspended" and was therefore entitled to a hearing under § 16-13-5. Martone, 824 A.2d at 428-29. We reversed, holding that the teacher had not been "suspended;" we expressly stated that, "[i]f an individual continues to be paid during the period in question, he or she ha[d] not been suspended." Id. at 432. We further noted that "[e]ven a constructive suspension requires that an individual be denied pay during the period in question." Id. (citing Perez v. Merit Systems Protection Board, 931 F.2d 853, 855 (Fed. Cir. 1991)). Perhaps most instructive for present purposes was our conclusion in Martone that "[t]he use of paid administrative leave provides a reasonable means of immediately neutralizing a potentially contentious situation while minimally affecting the [employee]." Id. at 433.

It is clear to us, from the facts surrounding Mr. Russo's placement on paid administrative leave, that the MHRH was attempting to do precisely what we described in Martone as "a reasonable means of immediately neutralizing a potentially contentious situation while minimally affecting the [employee]." The MHRH quite understandably opted to use paid administrative leave in order to defuse a difficult situation before it might escalate further.[9] Whether other decision-makers faced with such a situation would have acted in an identical manner is of little pertinence; what matters for present purposes is that there was nothing wrongful in what the MHRH did to deal with the real-world situation with which it had to cope. See Croce v. State, Office of Adjutant General, 881 A.2d 75, 80 n. 9 (R.I. 2005) ("'Courts may not sit as super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions.'") (quoting Mesnick v. General Electric Co., 950 F.2d 816, 825 (1st Cir. 1991)). It follows that, if administrative leave with pay is not a suspension and has been deemed by this Court to be a reasonable means of coping with a problematic workplace situation while only "minimally affecting" the employee (see Martone, 824 A.2d at 433), then placing Mr. Russo on administrative leave with pay, even with the requirement that he undergo an IME, was not a "discharge, threat[], or * * * discriminat[ion]" under the WPA.

Our confidence in the conclusion that placing Mr. Russo on paid administrative leave was not a "discharge, threat[], or * * * discriminat[ion]" under the WPA is bolstered by a review of federal case law; that case law construes the term "adverse employment action" and requires

---

[9] Mr. Clancy testified, in his deposition, that Mr. Russo was placed on "administrative leave[] [s]o there would be no problems on either side for that period of time." Mr. Clancy further testified, in reference to the Highview Building, as follows: "There was an ongoing back and forth. It put [Mr. Russo] in jeopardy, and it put the other employees in jeopardy. Sometimes the best thing to do is pay someone not to be in the problem. That's the choice we took."

that, to be actionable, the employment action must have been materially adverse in order to "prevent lawsuits based upon trivial workplace dissatisfactions" or "bruised ego[s]." White v. Burlington Northern & Santa Fe Railway Co., 364 F.3d 789, 795, 797 (6th Cir. 2004) (en banc) (internal quotation marks omitted). The just-cited decision of the United States Court of Appeals for the Sixth Circuit was subsequently affirmed by the United States Supreme Court in its decision in Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006). In its opinion in that case, the Supreme Court required that an employee demonstrate that "a reasonable employee would have found the challenged action [by the employer] materially adverse, [meaning that the action by the employer] well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68 (emphasis added) (internal quotation marks omitted); see also Janie F. Schulman & Nancy M. Modesitt, Whistleblowing: The Law of Retaliatory Discharge, 9-9 to 9-11 (2d ed. Supp. 2013). A materially adverse employment action has further been defined as a "material employment disadvantage, such as a change in salary, benefits, or responsibilities." Singletary v. Missouri Department of Corrections, 423 F.3d 886, 891 (8th Cir. 2005) (internal quotation marks omitted); see Breaux v. City of Garland, 205 F.3d 150, 157 (5th Cir. 2000) (stating that "[a]dverse employment actions are discharges, demotions, refusals to hire, refusals to promote, and reprimands") (internal quotation marks omitted); see also Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761, 762 (1998) (defining a tangible employment action as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits" which "in most cases inflicts direct economic harm"). However, the employment action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities[;] * * * not

- 15 -

everything that makes an employee unhappy is an actionable adverse action." Nichols v. Southern Illinois University-Edwardsville, 510 F.3d 772, 780 (7th Cir. 2007) (internal quotation marks omitted); see also White, 364 F.3d at 795 ("Employment actions that are de minimis are not actionable * * * .").

While we are cognizant of the fact that the trial justice was confronted with a complex factual situation and a statutory provision that had never been construed by this Court and while we are not unsympathetic regarding his strong statements concerning what he perceived to be the motivation of some of the individuals involved in this case, we hold as a matter of law that the placing of Mr. Russo on paid administrative leave did not violate the WPA or indeed constitute an adverse employment action. The United States Supreme Court stated that, in analyzing a given act of retaliation, "[c]ontext matters." White, 548 U.S. at 69. In the context of the instant case it is noteworthy that the duration of Mr. Russo's paid administrative leave was approximately two months and that the parties stipulated to the fact that he did not receive any diminution in salary during his leave. Moreover, Mr. Russo's salary continued to include his shift differential, and he returned to work in the same position he had previously held. Thus, there is no evidence that he suffered any change in his salary, benefits, or job responsibilities. See Singletary, 423 F.3d at 891. What is more, several federal appellate courts have specifically held that administrative leave with pay is not an adverse employment action.[10] See id. at 891-92

---

[10] It is worth noting that a majority of the judges of one federal Court of Appeals, sitting en banc, have found that administrative leave with pay could be an adverse employment action, stating that "[t]he inability to take a promotional exam, loss of [on-call and holiday] pay and opportunities for investigative experience, as well as the general stigma resulting from placement on administrative leave appear reasonably likely to deter employees from engaging in protected activity." Dahlia v. Rodriquez, 735 F.3d 1060, 1079 (9th Cir. 2013) (en banc) (internal quotation marks omitted). Notably, the decision of the United States Court of Appeals for the Ninth Circuit in Dahlia did not state that administrative leave with pay would always constitute an adverse employment action. Moreover and very significantly, the employee in Dahlia, unlike

(holding that administrative leave with pay followed by a return to the same position was not an adverse employment action); see also Kenney v. Merit Systems Protection Board, 356 F. App'x 394, 396 (Fed. Cir. 2009) (holding that administrative leave with pay was not an adverse action); Joseph v. Leavitt, 465 F.3d 87, 91 (2d Cir. 2006) (holding that administrative leave with pay pending criminal charges was not an adverse employment action); Peltier v. United States, 388 F.3d 984, 988 (6th Cir. 2004) (holding that an employee on administrative leave with pay while an internal investigation was pending was not subject to an adverse employment action); Von Gunten v. Maryland, 243 F.3d 858, 869 (4th Cir. 2001) (holding that an employee who had been placed on administrative leave with pay pending an investigation of a customer complaint did not suffer an adverse employment action).[11]

The decision of the United States Court of Appeals for the Fifth Circuit in Breaux v. City of Garland, 205 F.3d 150 (5th Cir. 2000) is particularly instructive. The plaintiff in Breaux was a police officer who was required to undergo a psychiatric exam after he made a comment to another officer that he was "surprised that someone had not already shot an Internal Affairs investigator between the eyes." Id. at 154 & n. 7. Similar to Mr. Russo's paid administrative leave being coupled with a requirement that he undergo an IME, the plaintiff police officer in Breaux, in addition to undergoing a psychiatric evaluation, was also placed on paid administrative leave. Id. at 154. The court in Breaux held that neither the psychiatric examination nor the administrative leave with pay constituted an adverse employment action. Id. at 158; see also McCoy v. City of Shreveport, 492 F.3d 551, 559 (5th Cir. 2007); Benningfield v.

---

Mr. Russo, lost holiday and on-call pay, opportunities for investigative experience, and the opportunity to take a promotional exam.

[11]    The decision of the United States Court of Appeals for the Fourth Circuit in Von Gunten v. Maryland, 243 F.3d 858 (4th Cir. 2001) was abrogated on other grounds by Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 61 (2006).

City of Houston, 157 F.3d 369, 376 (5th Cir. 1998) (holding that, when an employee was required to undergo psychological testing which was designed to assess her fitness for duty, that requirement was not an adverse employment action but rather it was "designed to gather facts to form the basis for an employment decision"). The Fifth Circuit's holding in Breaux is consistent with the holdings of other federal Circuit Courts. In Caver v. City of Trenton, 420 F.3d 243, 256 (3d Cir. 2005) the United States Court of Appeals for the Third Circuit held that a police department's requirement that an officer submit to psychological examinations was not an adverse employment action; the court stated: "Where an officer is not guaranteed a negative evaluation upon entering the psychiatrist's office, merely being required to undergo an evaluation does not harm the officer's employment opportunities." In Nichols, the United States Court of Appeals for the Seventh Circuit held that an employee on a university's police force was not subjected to a materially adverse employment action when he was placed on paid administrative leave pending the results of a "fitness-for-duty psychological examination[] after he used force to restrain a mentally unstable woman * * * ." Nichols, 510 F.3d at 787. We perceive no material difference between the factual contexts of these several federal appellate cases and the factual context of Mr. Russo's case.

Additionally, we deem it worth noting that the only evidence elicited at trial which even remotely suggested that Mr. Russo could have been subject to any disciplinary action was Ms. Sherman's testimony that, if an employee was required to undergo an IME and refused, there could be "disciplinary action," which would be handled on a "case-by-case basis." However, we observe that Ms. Sherman also testified that plaintiff's paid administrative leave was not disciplinary, and plaintiff himself testified that he was told that his "job was safe." We cannot conclude that a reasonable employee would be deterred from alleging discrimination or engaging

- 18 -

in further whistleblowing when there is no threat to his or her continued employment, salary, or benefits. See White, 548 U.S. at 68 ("[w]e refer to reactions of a reasonable employee because we believe that the provision's standard for judging harm must be objective;" "[a]n objective standard is judicially administrable") (emphasis in original). Our conclusion is not affected by Mr. Russo's testimony that he hired an attorney after being placed on paid administrative leave because he felt his "job was on the line." In our judgment, it is not enough for an employee to decide that he or she needs legal representation when no disciplinary action has been taken and the employee has been assured that his or her job is "safe." It is our opinion that the fact that Mr. Russo decided to hire an attorney cannot, in our view, transform an otherwise neutral employment action into an adverse employment action. Accordingly, we find ourselves in agreement with the above-referenced federal appellate decisions: paid administrative leave, even with the requirement that an employee undergo an IME, is not an adverse employment action. For this reason, we conclude that it should not be considered a "discharge, threat[], or discriminat[ion]" under the WPA.

Mr. Russo's arguments on appeal do not persuade us otherwise. While he cites to the appropriate sections of the WPA dealing with damages[12] and describes what he contends to be his damages in the instant case (namely the fee charged for legal representation during his paid administrative leave and compensation for his anxiety and emotional trauma), in our view he has put "the damages cart before the retaliation horse" (in the metaphorical language employed by defendant). It should go without saying that, before a whistleblower-plaintiff may recover damages under the WPA, it must first be proven that the WPA was in fact violated. In the instant case, we have concluded that the MHRH did not "discharge, threaten, or otherwise

---

[12]    Mr. Russo cites specifically to G.L. 1956 § 28-50-4(a) and § 28-50-4(c), which deal with the relief available to a plaintiff under the WPA.

discriminate" against Mr. Russo; as a result, he is not entitled to any damages pursuant to the WPA.

The plaintiff has cited only one case dealing with paid administrative leave—a federal trial court decision. See Bushfield v. Donahoe, 912 F. Supp. 2d 944, 957 (D. Idaho 2012). In stark contrast with the facts of the instant case, however, the paid administrative leave in the Bushfield case was coupled with what the trial court described as an "unrelenting" investigation into the severity and effects of the plaintiff's posttraumatic stress disorder. Id. That investigation involved the plaintiff having to "endure personal questions asked by his non-health professional supervisors" even though there had already been a determination as to disability by the United States Department of Veterans Affairs. Id. Nothing remotely similar transpired in the case before us, and we do not consider Bushfield to be meaningfully supportive of plaintiff's contentions.

The two other cases that plaintiff relies upon are likewise radically distinguishable since they deal with suspensions without pay. See White, 548 U.S. at 70 (concluding that there was enough evidence to support a jury verdict that a reassignment and a thirty-seven-day suspension without pay amounted to retaliation); Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223, 224 (2d Cir. 2001) (holding that a suspension without pay "is sufficient to constitute an adverse employment action," even if the plaintiff was later reimbursed—because the plaintiff "suffered the loss of the use of her wages for a time").

Accordingly, we conclude that Mr. Russo's contentions on appeal are not persuasive and do not alter our determination that the decision of the MHRH to place him on paid administrative leave with the requirement that he undergo an IME was not an adverse employment action.

Consequently, we hold that, as a matter of law, the MHRH did not "discharge, threaten, or otherwise discriminate against" plaintiff in violation of the WPA.

Since the MHRH did not "discharge, threaten, or otherwise discriminate" against Mr. Russo, it cannot be found to have violated the WPA and the trial justice's decision must be reversed. We need delve no further into the MHRH's other contentions on appeal.

## IV

## Conclusion

The judgment of the Superior Court that the MHRH violated the Rhode Island Whistleblowers' Protection Act is vacated, and this case is remanded to that tribunal with instructions that it enter judgment for the defendant.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**    Peter W. Russo v. State of Rhode Island, Department of Mental Health, Retardation and Hospitals et al.

**CASE NO:**    No. 2011-360-Appeal.
(PC 02-2214)

**COURT:**    Supreme Court

**DATE OPINION FILED:**    March 24, 2014

**JUSTICES:**    Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**    Associate Justice William P. Robinson III

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

    Associate Justice Francis J. Darigan, Jr.

**ATTORNEYS ON APPEAL:**

    For Plaintiff:  Ronald L. Bonin, Esq.

    For Defendant:  Thomas A. Palombo
                  Department of Attorney General